GOLDING & HAHN CO., INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 16006. Promulgated February 19, 1929.

*Mark Eisner, Esq.*, for the petitioner.
*Harold Allen, Esq.*, for the respondent.

**500**

LANSDON: In this proceeding the petitioner asks for a redetermination of a deficiency in income and profits tax which the Commissioner has asserted for the year 1920 in the amount of $14,077.44. The single issue is whether the petitioner is entitled to deduct $36,000 from its gross income in the taxable year as ordinary and necessary expenses incurred or paid in the conduct of its trade or business. The Commissioner has allowed a part of the deduction claimed in the amount of $3,593.90, disallowed the remainder, and determined the deficiency here in controversy.

The petitioner was a New York corporation, with its principal office in the City of New York. Its business has since been taken over by Golding Brothers, Inc. In the taxable year it was engaged in buying gray cotton fabrics for conversion into cretonne and other prints and in the sale of the finished product to customers throughout the United States and Canada. It operated no plants or factories but utilized the services of various fabric printing mills in Massachusetts and Rhode Island for the conversion of plain goods into the printed material which it sold to its customers. It had three stockholders who were also its directors. Alfred Hahn, the president, owned 50 per cent of the common and all the preferred stock. Joseph Golding and Samuel Golding, also directors, each owned 25 per cent of the common stock. Hahn was the office and financial manager and the Goldings traveled the country and sold the petitioner's products to the retail and wholesale trade, principally to the manufacturers of mattresses and other beddings.

On December 15, 1920, a special meeting of the stockholders and directors of the petitioner, held at the office in New York, considered the expenditures incurred by each of the stockholders on behalf of the company in that year and authorized the payment to each of the amount of $12,000 as reimbursement for disbursements made in the interest of the petitioner. In certain schedules submitted to the Board and received in evidence the petitioner sets out the actual amounts claimed to have been so expended by the three directors.

The statement of amounts alleged to have been expended by Alfred Hahn in the interest of the petitioner in 1920 includes three items: Chicago convention, $2,750; 32 trips to mills, $6,400; bonuses to mill help, $3,300; or a total of $12,450.

The statement of the expenses alleged to have been incurred by Joseph Golding in the year 1920 in the interest of the petitioner includes eight items: Chicago convention, $2,800; New York and New England trip, January 23 to February 14, $1,144.68; coast trip, February 15 to April 27, $2,624.01; middle western trip, May 2 to June 30, $4,617.44; second coast trip, July 5 to August 30, $2,852.01; Cana-

dian trip, September 8 to September 22, $1,104.96; second middle western trip, October 3 to November 25, $3,914.44; second New England trip, November 27 to December 17, $853.68; or a total of $19,911.22.

The statement of the expenses alleged to have been incurred and paid by Samuel Golding in the taxable year in the interest of the petitioner includes four items: Chicago convention, $3,150; coast trip February 15 to April 27, $6,543.01; middle western trip, May 10 to June 23, $3,680.16; second coast trip, August 28 to December 21, $5,311.01; or a total of $18,684.18.

The complete schedule of the Canadian trip made by Joseph Golding is as follows:

| | |
|---|---|
| Sept. 8 Chicago, Ills. | Sept. 14 Red Dier (Red Deer). |
| 9 Calgary, Can. | 15 St. Johns. |
| 10 Bothwell, Ont. | 16 Stratford, Ont. |
| Chesley, Ont. | 17 Toronto, Ont. |
| Hamilton, Ont. | 18 Van Couver, B. C. |
| Kitchner, Ont. | 19 Waterloo, Ont. |
| London, Ont. | Windsor, Ont. |
| 11–12 Montreal, P. Q. | 20 Halifax, N. S: |
| New Glasgow, P. Q. | 21 Winnipeg, Manitoba. |
| Ottawa, Ont. | 22 Chicago, Ills. |
| 13 Quebec, P. Q. | $1,104.96 |

The copy of the corporate minutes of the meeting of December 15, 1920, of stockholders and directors, in which payments to Alfred Hahn, Joseph Golding, and Samuel Golding in reimbursement of expenses were authorized, recites that " all the directors and stockholders were present in person," and is signed by Sam Golding, secretary, and A. Hahn, president. The schedules of travel introduced in evidence show that on the day of such meeting Sam Golding and Joe Golding were in Chicago, and Springfield, Mass., respectively.

In the income and profits-tax return of the petitioner for 1920 it is set forth and sworn to by the president of the petitioner that Alfred Hahn, Sam Golding and Joe Golding each devoted his entire time to the affairs of the petitioner in that taxable year and that each received a salary of $5,500. In the income and profits-tax return for the same year of Golding Brothers, a corporation owned by the same parties and engaged in similar business and later the successor of this petitioner, it is set forth that Sam Golding and Joe Golding each devoted his entire time to the business of such Golding Brothers, and that each received a salary in the amount of $24,000 for his services.

The theory upon which the petitioner bases its claim of right to take the deduction in controversy is that the year 1920 was an extraordinarily hazardous period in the cotton-converting trade and that without heroic measures of some sort its business was likely to be

destroyed. Large purchases of gray goods had been made in advance at prices that prevailed when raw cotton sold for something like 40 cents per pound, and products to be developed from such purchases had been sold in advance at correspondingly high prices. Early in the year cotton prices began to decline and some of the customers of the petitioner sought to cancel their contracts and some refused to accept merchandise after it had been shipped and invoiced to them. In these conditions the petitioner sought to save its business by having its officers personally call on its customers for the purpose of persuading them to accept shipments and make payments on contracts previously entered into. It was also necessary to speed up production at the printing mills in order that a large volume of deliveries might be made before customers could realize the situation and take measures for evading their contractual obligations. Petitioner admits that the greater part of the amount of $50,000 which it claims was spent by its officers in the taxable year was used for the entertainment of its customers and as largesses, tips or bonuses to encourage mill employees to speed up the delivery of its finished product.

Supporting its claim by the facts and allegations set forth above, the petitioner asks this Board to determine that it is entitled to deduct from its gross income in the taxable year the amount of $36,000 alleged to have been authorized or incurred by proper corporate action on December 15 of such year as ordinary and necessary expenses incurred in its trade or business. In proceedings which involve only the determination of facts it is not our custom to engage in any extended analysis of the bases for our conclusions, but in the instant case the deficiency is substantial, the circumstances are so unusual, and the evidence is so extraordinary in its nature and implications that we think it best to depart from our usual method and discuss in some detail the assertions and allegations of the petition, the oral testimony of the witness, and the documentary and other evidence submitted for our consideration.

In the detailed schedule of his trip through Canada, from September 8 until September 22, Joseph Golding at a cost of only $1,104.96 made a remarkable record as a traveler. This schedule shows that on September 8 Joseph was in Chicago, and that on the next day he was in Calgary, Canada; after a one-night journey of more than 2,000 miles. That jump shows some expedition in moving about, but gives only a faint picture of the ease and speed with which this earnest and tireless traveler transferred himself from one point to another in the very considerable area included in the Dominion of Canada. After spending September 9 in Calgary, we find that on the 10th he was in Bothwell, Chesley, Hamilton, Kitchener and London, Ontario. The shortest distance between Calgary and the

nearest of these towns is much more than 2,000 miles, and that all four of them were made in a single day notwithstanding the fatigue incident to the long journey of the night before eloquently testifies to the industry and zeal of a man who shrank from no labor or privation necessary to save his business from disaster. On the 17th of September Joseph was in Toronto, and the 18th in Vancouver, only about 2,700 miles away. From Vancouver he jumped, flew or skipped back to Ontario, where he spent the 19th at Waterloo and Windsor. On the 20th he was in Halifax, N. S., on the 21st in Winnipeg, Manitoba, and on the 22nd he was back in Chicago, after having completed a trade trip which any fair minded man must admit was one of the most strenuous and remarkable tours in the history of the business of cotton converting or of any other commercial enterprise, even in this era of aviation, radio and television. Such an accomplishment is all but miraculous.

Upon the record it is also conclusively established that Joseph Golding is a fast worker as well as a remarkable traveler. His schedule shows that he spent the 17th of September in Toronto, and that on that day he called on the Arrow Bedding Co., A. Bradshaw & Son, Canadian Feather & Mattress Co., Gold Medal Furniture Co., Marshall Ventilated Mattress Co., National Mattress Felt & Batting Co., Reliable Mattress Co., Simmons Co., Standard Bedding Co., Toronto Bedding Co., Toronto Feather & Down Co., Whitworth & Restall, and McLeod Bros., or a total of some 14 concerns, and all this notwithstanding the fact that he must have been greatly fatigued by his long trip from St. Johns, N. B., where he was on the 15th, with a stop on the way back to call on a couple of concerns at Stratford, Ontario.

It appears from the itineraries submitted in evidence that Samuel and Joseph Golding traveled together on the first trip to the Pacific Coast in 1920. They left Chicago on February 15 and returned to that city on April 27, and each visited the same towns on the same dates. Just which of the two rendered the more efficient service in persuading customers that contracts should not be canceled is not apparent from the schedule or from any evidence adduced at the hearing, but the claim is made that on this trip of some 75 days Sam spent $6,543.01 and that Joseph got by with the comparatively small outlay of $2,624.01, or approximately $4,000 less than it cost his brother Sam, who presumably rode the same trains and stopped at the same hotels. It is a fair inference, therefore, that Joe did his persuading by personal contact and argument and that Sam relied largely on the soothing and softening effect of entertainment. Later in the year each of the brothers made a second visit to the coast. On his trip Joseph left Chicago on July 5 and returned to that place on August 28, at a cost of $2,852.01. On the same day that Joe got back

504

Sam started on his second coast trip, visited exactly the same towns and presumably the same customers that had just been seen by Joe and completed the round trip to Chicago on December 24, at a cost of $5,311.01. It will be noted that the total of each account is a certain number of dollars plus one cent, which possibly may be regarded as evidence of the meticulous care exercised in keeping track of every item of expense that was incurred in the operation of the trade or business in which these two remarkable travelers were engaged. The several trips to the coast were made with a good deal of speed, but in no instance is Joseph's tour through Canada equaled or even approached for celerity and dispatch, although it appears that on such journeys each of the brothers was able to do business in Salt Lake City and in Portland, Oreg., and in Seattle, Wash., and Sacramento, Calif., on successive days, notwithstanding the fact that the fastest railroad trains require more than 24 hours to cover the distance traveled between one town and the next.

Alfred Hahn was the president and office manager of the petitioner in the taxable year. The product sold was printed in mills in Massachusetts and Rhode Island. He testified on oath at the hearing, and furnished a statement which was accepted for the record, that he made 32 trips to the mill towns for the purpose of hurrying up production in the taxable year and that such trips cost him $6,400, or an average of $200 a trip. As none of these towns is as far as 200 miles from New York City, it is obvious that the railway fares paid could not have averaged more than $10 a round trip, or a total of $320 for all the journeys to the mills. This leaves a balance of a little more than $6,000 which Hahn must have spent for subsistence and for the entertainment of customers or mill managers who were printing fabrics for the petitioner, or in the purchase of certain automobiles which he testifies he presented to some persons in his eager and zealous efforts to save his business from irretrievable disaster. Hahn also swore that he paid the amount of $3,300 to mill help as bonuses to encourage speed in getting out his orders. If other customers of the same printing mills were equally generous it is clear that the mill managers and mill help must have been well entertained and well bonused during 1920 and that wages from their employers may have been only a negligible part of the earnings of one group of New England mill executives and operatives in that year.

January 9 to 17, 1920, all three of the principal stockholders and officers of the petitioner attended a trade convention of bedding concerns in Chicago. At this convention the petitioner claims that its representatives spent approximately $3,000 each, or a total of $8,700 for travel, subsistence and the entertainment of customers. The record includes no itemized statement of the cost of travel and sub-

sistence, but allowing $10 per day for room and board and making generous provision for railway and Pullman fares, meals and tips en route, it is certain that the ordinary and necessary expenses of the round trip from New York to Chicago could not have been more than $300 per man, or a total of $900. This leaves approximately $8,000 that was spent in entertaining customers. Hahn testified that this entertainment consisted of a series of banquets at each of which there were from 30 to 50 invited guests, the supply of " booze " purchased for the use of customers and after-midnight theater parties and other undescribed diversions for customers. As the slump in business and decline in cotton prices did not begin until about the 1st of May, it is obvious either that the expenditures were not incurred in warding off a business disaster then known to be impending, or that if so, the officers of the petitioner must have been gifted with a second sight which enabled them to foresee a situation not even suspected by other business men.

In his brief counsel for the respondent harshly criticizes the ethics of the petitioner's method of securing and holding business and suggests that it is an insult to the dignity and intelligence of this Board to ask that amounts spent in the purchase of liquors, in securing illicit entertainment for the diversion of customers, and in tips or bonuses to the employees of printing mills should be regarded as ordinary and necessary business expenses. It may be that this is true, but, subject to the provisions of the law and our rules, every appellant before this Board is entitled to try his case in his own way. This proceeding was instituted in all seriousness, was zealously prosecuted by counsel, and can hardly be characterized as a mere frivolous attempt further to postpone the payment of taxes already overdue. In these circumstances we are not inclined to indulge in any criticism of the petitioner or its counsel, or take any action other than to consider the evidence, weigh the argument of counsel, and decide the question submitted.

The law provides for deduction from gross income of ordinary and necessary expenses incurred or paid in the operation of a trade or business. Whenever a taxpayer takes such deductions it is the duty of the Commissioner to determine whether the amounts so claimed fall within the intendment of Congress as expressed in the taxing statutes. In the instant proceeding such determination denies the contention of the petitioner and adds to income certain amounts deducted in the petitioner's return for the taxable year. Under the law and our rules of procedure the determination of the Commissioner establishes a prima facie case for the Government. To prevail in this controversy the petitioner must adduce evidence sufficient to overcome the presumption that the action of the respondent is correct. It is asserted that on December 15, 1920, the petitioner, by appro-

priate corporate action, was duly authorized to pay $12,000 to each of its three stockholders to reimburse them for costs of travel and entertainment of customers which they had theretofore advanced from their own funds. There is no persuasive evidence that such advances were authorized by the company, that the amounts thereof were actually expended as alleged, or that the petitioner paid anything to its stockholders on account thereof either in the taxable year or at any other time. It is true that documents purporting to be itemized statements of the expenditures alleged to have been made by the officers of the petitioner when traveling in its interest have been submitted in evidence. In such statements, however, there are no segregations showing amounts paid for railway fares, hotel bills, and other expenses ordinarily incurred by commercial travelers.

Apparently recognizing the infirmity of the evidence, both as to the nature of the alleged expenditures and as to whether as a matter of fact they were ever made, counsel for the petitioner develops and advances the theory that the corporate authorization to reimburse stockholders for amounts which the petitioner is satisfied were expended in its interest is enough to establish deductibility. In his brief he thus states his theory:

In other words, in the case at issue it would not be necessary for the petitioner to prove any further facts than that it paid to its officers certain amounts as reimbursement for expenses incurred by such officers. The character of the traveling, entertainment or outlays of any kind by the officers would not be necessary. The only proof necessary to sustain this case would be that appropriate resolutions were passed and that the sums set forth in the resolution were paid.

We are unable to accept this theory. We think the taxing officers of the Government very properly may require proof that deductions claimed as herein fall within the commonly accepted and legally determined definition of ordinary and necessary expenses incurred in a trade or business. Obviously the principle and procedure suggested by counsel would be satisfactory to this petitioner, since in our opinion it would permit stockholders to withdraw profits undiminished by taxes paid at the source, and that as reimbursements for advances would not be income taxable to the recipients. The circumstances of this proceeding clearly indicate that the rule devised by counsel could not be applied without jeopardizing the collection of revenues due to the Republic and essential to its safety. The clever and ingenious argument of the learned counsel fails to convince us that his theory is either sound or safe.

After a careful consideration of the evidence and the arguments of counsel, we are of the opinion that the petitioner has failed to overcome the presumption that the determination of the respondent is correct.

*Decision will be entered for the respondent.*